UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| **KARIM MIKHAIL,** | Case No. 23–cv–01856–ESK–EAP |
| Plaintiff, | |
| v. | OPINION |
| **AMARIN CORPORATION, plc;** *et al.,* | |
| Defendants. | |

**KIEL, U.S.D.J.**

   **THIS MATTER** is before the Court on defendants Amarin Corporation plc (Amarin plc), Amarin Pharma, Inc. (Amarin Inc.),[1] and Amarin Switzerland GmbH's (Amarin Switzerland) renewed motion to dismiss (ECF Nos. 67, 67–12 (Mot. Br.)) the first amended complaint (Complaint) (ECF No. 23 (Compl.)). Plaintiff filed an opposition to the Motion (ECF No. 71 (Opp'n Br.)), in response to which defendants filed a reply (ECF No. 72) (Reply Br.)). For the following reasons, the Motion will be **GRANTED**.

   **I.   BACKGROUND**

   Plaintiff Karim Mikhail is a New York citizen and the former president and chief executive officer of Amarin plc. (Compl. ¶¶ 1, 14.) Amarin plc is a corporation of England and Wales, with its principal place of business in Ireland. (*Id.* ¶ 2.) Amarin Inc. is a Delaware corporation with its principal place of business in New Jersey. (*Id.* ¶ 3.) Amarin Switzerland is a Swiss corporation headquartered in Switzerland. (*Id.* ¶ 4.) Plaintiff seeks dismissal

---

   [1] Defendants state that Amarin Inc. is incorrectly named as Amarin Pharmaceuticals, Inc. (Mot. Br. p.6.)

of the Complaint, which asserts three claims relating to a Contract of Employment (Contract) between Amarin Switzerland and plaintiff, and Amarin plc's Executive Severance and Change of Control Plan (Severance Plan). (*Id.* ¶¶ 7, 12; ECF No. 67–2 (Contract); ECF No. 67–3 (Severance Plan).) I incorporate by reference the factual background in Judge Castner's opinion of February 29, 2024. *Mikhail v. Amarin Corp., PLC*, Case No. 23–01856, 2024 WL 863427 (D.N.J. Feb. 29, 2024).

### A. Contract and Severance Plan

The Contract was executed on April 12, 2021, between Amarin Switzerland and Mikhail, and is governed by Swiss law. (Contract pp.1, 2; §26.) The Contract appoints Mikhail as chief executive officer (CEO) of Amarin Switzerland, as president and CEO of Amarin plc., and as a member of Amarin plc.'s Board of Directors. (*Id.* §§2.2, 2.3.) Mikhail is tasked with a number of duties and responsibilities in the Contract, including "in relation to the Company and the business of the Group." (*Id.* §3.1.) The Contract defines the "Company" as Amarin Switzerland, "where the context so permits or requires … its subsidiaries and associated companies" and "unless the context otherwise requires, … any person acting on behalf of the Company within his proper authority." (*Id.* p.2; §1.2.) The Contract defines "associated companies" to include "Amarin Pharmaceuticals Ireland Ltd, Amarin Corporation plc and Amarin Pharmaceuticals Inc." (*Id.* §1.1.) Similarly, "Group" is defined as "the Company and its associated companies." (*Id.*)

Either party may terminate the Contract "upon a six months' prior written notice," or "with immediate effect for a justified cause pursuant to Article 337 Swiss Code of Obligations (CO/OR)." (*Id.* §§18.3, 18.4.) The Contract also provides that Mikhail "will be eligible for severance pay and benefits under terms and conditions that are no less favorable than pursuant to Amarin plc's

Executive Severance and Change of Control Plan … subject to any Swiss law requirements."  (*Id.* § 18.7.)

The Severance Plan outlines benefits to "Eligible Executive(s)" defined as "United States employee(s) of the Company or any of its Subsidiaries at the level of Vice President or above at the time of the Date of Termination (or, if applicable, at the time of a Change of Control)."  (Severance Plan § 2(n).) "Change of Control" is defined by Section 409A of the Internal Revenue Code and must "constitute a 'change in the ownership or effective control' of the Company or a 'change in the ownership of a substantial portion of the Company's assets."  (*Id.* §§ 2(e), (h).)  "Control" is "the ownership of more than 50 percent of the issued share capital or other equity interest of the Company or the legal power to direct or cause the direction of the general management and policies of the Company."  (*Id.* § 2(k).)

The Severance Plan also subjects Eligible Executives to the Company's "Good Reason Process" which requires the Executive to find "in good faith that a 'Good Reason' condition has occurred."  (*Id.* § 2(o).)  "Good Reason" could be a number of conditions as defined in the Severance Plan, including "a material diminution in the Eligible Executive's authority, duties or responsibilities," and "a material breach by the Company of an Employment Agreement."  (*Id.*)  The "Eligible Executive" must then notify "the Company in writing of the Good Reason condition within 30 days of the first occurrence of such condition," and allow for a "Cure Period" following such notice for the condition to be remedied. (*Id.*)  "If the Company cures the Good Reason condition during the Cure Period, Good Reason shall be deemed not to have occurred."  (*Id.*)

The Contract's Garden Leave provision applies "during all or any part of any period of notice," so long as "the Executive will continue to receive his salary and contractual benefits" during that period.  (Contract § 19.)  The Contract also provides for the Executive's entitlements under "Amarin Corporation plc's

3

2020 Stock Incentive Plan" and its acceleration clause, dependent on a "Change of Control." (*Id.* §9.1.) A number of events could "constitute a 'Change of Control' for purposes of the [Stock Incentive] Plan." (ECF No. 67–4 (Stock Incentive Plan) §7(a).) One such event is "any person or company (either alone or together with any person or company acting in concert with him or it) (an 'Acquiring Company')) obtaining Control of the Company." (*Id.* §7(a)(i).) "Control" in the Stock Incentive Plan is "the ownership of more than fifty (50) % of the issued share capital or other equity interest in the Company." (*Id.* §2(o).)

### B. Plaintiff's Allegations

Mikhail contends that a "Change of Control" occurred under the Severance Plan in February 2023 when Sarissa Capital Management LP (Sarissa), Amarin plc.'s largest shareholder, nominated seven nominees who were successfully elected "to serve on Amarin's Board of Directors" (Board), "expanding the [B]oard to 15 directors." (Compl. ¶¶89, 110.) The seven incumbent directors resigned, "allow[ing] Sarissa … to gain immediate control of the Company." (*Id.* ¶¶126, 127.) Plaintiff alleges the newly constructed Board "bullied the remaining Amarin board members … to resign," and as a result of the newly constructed Board "Sarissa gained full and absolute control of Amarin." (*Id.* ¶¶112, 129.)

Plaintiff further asserts that following Sarissa's successful proxy contest, plaintiff's executive authority was undermined by the Board. (*Id.* ¶164.) On March 6, 2023—the day that Amarin plc announced the resignation of the "non-Sarissa board members"—plaintiff met with Board Member Odysseas Kostas, at Kostas' request. (*Id.* ¶¶ 119, 120, 127.) Kostas allegedly told plaintiff that their "objective is the same and our incentives are aligned" and stated that the Board "actually want[s] to work with you!" (*Id.* ¶¶120, 121.) Mikhail, however, claims that "the new Board had already decided to terminate him"

4

through Sarissa's communications targeting plaintiff during the proxy contest and that he requested the ability to "transition out of the company." (*Id.* ¶¶ 120, 122, 123.)

Mikhail subsequently emailed Kostas with "transition and severance details … in-line with the contract and severance plan," to which Kostas did not respond in writing. (*Id.* ¶¶ 131, 132.) Days later, at a town hall meeting held by the Board, Kostas allegedly told plaintiff "the Board is not interested in a short term transition" and if plaintiff "wanted to resign, 'just resign.'" (*Id.* ¶ 133.) Plaintiff then wrote to Amarin Inc. "seeking a resolution with the company" to which defendants' lawyer responded by asking whether plaintiff had resigned. (*Id.* ¶¶ 134, 135.) On March 20, 2023, Mikhail's lawyer wrote to defendants' lawyer "trying a final time to arrive at a good faith resolution but received no response from [defendants'] counsel." (*Id.* ¶ 136.)

Mikhail also alleges "Sarissa … made disparaging, inaccurate and misleading statements about" him and "directed the material diminution of his duties and responsibilities." (*Id.* ¶ 137–154.) He alleges the newly constructed Board was "freezing [him] out of the company's decision-making," and "isolat[ed] and disregard[ed] [him] and his input, divest[ed] him of his responsibilities at Amarin … and communicat[ed] with [his] team members without his knowledge." (*Id.* ¶ 138.) Mikhail cites to Sarissa's press releases and presentations made before the Sarissa-backed nominees were elected to the Board, including statements like "a history of reckless spending and self-serving unjust enrichment at Amarin," allegations that "the [B]oard acted in bad faith and engaged in numerous breaches of its fiduciary duties and violations of the law." (*Id.* ¶¶ 92–109.) Mikhail alleges "Sarissa's conduct … has impacted [his] standing within … Amarin, with … Amarin's shareholders and the investment community at large, as well as the pharmaceutical industry as a whole." (*Id.* ¶ 164.)

5

Mikhail gave "notice of his constructive termination from Defendant" on March 27, 2023, alleging "justified cause" pursuant to the Contract and to Article 337 of the Swiss Code of Obligations. (*Id.* ¶¶ 155, 159.) The notice asks "whether Amarin will require [Mikhail] to take Garden Leave." (*Id.* ¶ 155.) Plaintiff also alleges a "Change of Control" and "Change of Control event" occurred under the Severance Plan and the Stock Incentive Plan, and "Good Reason" existed under the Severance Plan. (*Id.* ¶¶ 180–187.)

### C. Procedural History

On March 31, 2023, plaintiff commenced this action in the Superior Court of New Jersey, Somerset County. (ECF No. 1 ¶ 2.) Defendants timely removed on April 7, 2023, on the basis of diversity jurisdiction. (*Id.*) Plaintiff filed an amended complaint on June 13, 2023. (Compl.) Defendants filed a motion to dismiss on June 30, 2023. (ECF No. 26.) On February 29, 2024, Judge Castner denied the motion to dismiss without prejudice and ordered the parties to "complete jurisdictional discovery." (ECF Nos. 33, 34.) Following completion of jurisdictional discovery, defendants withdrew their jurisdictional objections and sought leave to file a renewed motion to dismiss. (ECF No. 63 p. 1.) I granted defendants' request for leave to file their renewed motion to dismiss. (ECF No. 66.)

Defendants filed a motion to dismiss on March 20, 2025. (Mot. Br.) On May 21, 2025, plaintiff filed his opposition brief. (Opp'n Br.) Defendants subsequently submitted a reply brief on June 18, 2025. (Reply Br.)

### II. PARTY ARGUMENTS

Defendants seek dismissal of the Complaint pursuant to Federal Rule of Civil Procedure (Rule) 12(b)(6). (Mot. Br. p. 6.) Defendants argue that the claims against Amarin Inc. should be dismissed because it is not a party to the Contract or the Severance Plan. (*Id.* pp. 7–9.) Defendants also argue that

6

Mikhail fails to plausibly assert a breach of the Contract because plaintiff did not have "justified cause" under Swiss law to terminate his employment with Amarin Switzerland. (*Id.* pp. 7, 8.) As to the Severance Plan, according to defendants, "[p]laintiff does not adequately allege a breach of [the] Severance Plan," since "only United States employees of Amarin plc or its subsidiaries are entitled to benefits under the Severance Plan," and even if plaintiff is considered a United States employee, "no Change of Control" occurred, and "[p]laintiff has not alleged 'Good Reason' for his resignation." (*Id.* p. 7.) Finally, defendants argue that plaintiff's claim for breach of the implied covenant of good faith and fair dealing should be dismissed as plaintiff's claims were "conclusory," and "rest[ed] on the same exact conduct as plaintiff's breach of contract claims." (*Id.* p. 8.)

Plaintiff counters that Amarin Inc. "is included as a party under the plain language of the Contract" and moreover, the "determination" as to "whether an affiliated entity of [d]efendants can be held responsible under the Contract" is a question of fact to be decided after discovery. (Opp'n Br. p. 6.) Plaintiff also argues that under Swiss law "the [b]reach of the Contract … count can be sustained" as plaintiff "sufficiently alleges timely notice and 'Good Cause.'" (*Id.* p. 7.) Plaintiff argues that he has pleaded "sufficient facts to maintain a breach of the Severance and Change of Control Plan" to show he was a United States-based executive and that a Change of Control occurred, or alternatively that "a change in control is a fact question that requires discovery." (*Id.*) Finally, plaintiff claims he alleged "sufficient facts" for a claim of breach of the implied covenant of good faith and fair dealing, since defendant's conduct was "in bad faith and with harmful intentions." (*Id.*)

In reply, defendants again argue that "[p]laintiff has failed to allege any claims against Amarin Inc." as Amarin Inc. is "a separate and distinct entity," and not "a party to either the [Contract] or the Severance Plan." (Reply Br.

pp. 4, 5.) Defendants also argue that plaintiff has not sufficiently pleaded "justified cause" because the standard "contemplates scenarios where the employee is subject to physical abuse, sexual harassment, bullying severe enough to affect an employee's health, or workplace safety issues." (*Id.* p. 10.) Defendants argue that "[p]laintiff is not entitled to garden leave or any acceleration of his equity grants" as he "did not provide any period of notice" as required by the Contract's Garden Leave provision. (*Id.* p. 11.) Defendants also state there was no "Change of Control" under the Stock Incentive Plan. (*Id.* p. 12.) Defendants argue that plaintiff fails to allege a breach of the Severance Plan as his Contract specifies that he was a Swiss employee, and "neither prong" of the "Change of Control" analysis was met in plaintiff's Complaint. (*Id.* pp. 8, 9.) Finally, defendants again argue that the implied covenant of good faith and fair dealing claim "cannot circumvent the contractual requirements of the Severance Plan." (*Id.* p. 12.)

### III. LEGAL STANDARD

Before filing a responsive pleading, a defendant may move to dismiss a complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). To survive dismissal under Rule 12(b)(6), "a complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Doe v. Princeton Univ.*, 30 F.4th 335, 341 (3d Cir. 2022) (quoting Fed. R. Civ. P. 8(a)(2).) Courts shall accept the plaintiff's factual assertions, which "'plausibly suggest[]' facts sufficient to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* at 342 (first quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007); and then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Courts further evaluate the sufficiency of a complaint by "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of

8

the elements identified in part one of the inquiry are sufficiently alleged." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011).

## IV.  DISCUSSION

Swiss law governs claims relating to the breach of the Contract and New Jersey law governs the breach of Severance Plan and breach of the implied covenant of good faith and fair dealing claims.[2]

### A.  Amarin Inc.

I begin with plaintiff's claims against Amarin Inc.  To establish a *prima facie* claim for breach of contract, a plaintiff "must allege (1) a contract [existed] between the parties; (2) a breach of that contract; (3) damages flowing therefrom; and (4) that the party stating the claim performed its own contractual obligations."  *Frederico v. Home Depot*, 507 F.3d 188, 203 (3d Cir. 2007).  Here, the first prong is not met.

Generally, a contract claim "cannot be maintained against a person who is not a party to it."  *Figueroa v. City of Camden,* 580 F. Supp. 2d 390, 408 (D.N.J. 2008) (quoting *Comly v. First Camden Nat'l Bank and Trust Co.*, 36 A.2d 591, 593 (N.J. Sup. Ct. 1944)).  Amarin Switzerland is the "Company" referred to in the Contract, "which expression will[,] where the context so permits or requires[,] include its subsidiaries and associated companies."  (*Id.* p.2.)  In Contract also provides:

> "[A]ssociated company" or "associated companies" means any subsidiary undertaking or joint venture of the Company, any holding undertaking of the Company is a subsidiary undertaking, a subsidiary undertaking or joint venture of such a holding undertaking, or an undertaking in which any of the foregoing has a participating interest;

---

[2] The parties only cite to New Jersey and United States law relating to the claims against Amarin Inc.  It appearing that the parties agree that New Jersey and United States law apply to those claims, I adopt that understanding herein.

9

> and accordingly, "associated companies" of the Company shall include Amarin Pharmaceuticals Ireland Ltd, Amarin Corporation plc and Amarin Pharmaceuticals Inc.

According to plaintiff, this provision supports his argument that Amarin Inc., as an "associated company," is a party to the Contact.

Plaintiff cites to cases where a court determined that the question of whether a subsidiary or affiliate was a party to a contract was a question of fact. *See In re Tri Harbor Holdings Corp.,* Case No. 19–13448, 2021 WL 4877265, at *3 (Bankr. D.N.J. Oct. 5, 2021) (finding the "mere fact" an entity "did not sign the Agreement did not necessarily absolve [the company] of liability under the express terms of that Agreement"); *Players Network, Inc. v. Comcast Corp.*, Case No. 14–00238, 2015 WL 427909, at *3 (D. Nev. Feb. 2, 2015) ("The Court finds ambiguity regarding the definition of 'Company' in the Agreement. Whether 'on behalf of its operating affiliates' includes operating affiliates as parties to the Agreement is reasonably susceptible to different interpretations.").

These cases are distinguishable. In *In re Tri Harbor Holding Corp.*, the preamble to the agreement identified "subsidiaries and Affiliates" as a "contracting party." *In re Tri Harbor Holding Corp.*, 2021 WL 4877265, at *3. In *Players Network*, the agreement defined "Company" as "Comcast Programming Development, Inc., on behalf of its operating affiliates." *Players Network, Inc.*, 2015 WL 427909, at *2.

Here, Amarin Switzerland's associated companies—such as Amarin Inc.— are to be included in the definition of "Company" only "where the context so permits or requires." (Contract p. 3.) To draw in Amarin, Inc. as a party to the Contract would require me to focus only on the first two pages of the Contract and ignore the remaining 17 pages. This is because the other 17 pages define in what "context" reference to the associated companies is "permit[ted] and require[d]." For example, as the CEO of Amarin Switzerland,

10

as president and CEO of Amarin plc., and as a member of Amarin plc.'s Board (*Id.* §§ 2.2, 2.3), plaintiff was assigned "duties and responsibility" across the spectrum of "Defendant Amarin's"[3] business. Thus, Mikhail was "required" to "devote the whole of his time and attention … to the discharge of his duties … to promote the interest, welfare, and reputation of the Company and associated companies." (Contract § 3.1(d).) Indeed, every reference in the Contract to "associated companies" relates to Mikhail's duties and obligations for the benefit of the "associated companies."[4] Far from bringing Amarin, Inc. in as a party to the Contract, the associated companies, as part of the overall "Defendant Amarin's" business were provided benefits of Mikhail's employment as the highest level executive of the overall business and member of the Board. There is no ambiguity as to who the parties to Contract are and which party owes obligations to Mikhail under the Contract.[5]

Additionally, while plaintiff argues that the question of whether an "affiliated entity can be held responsible under a contract is a fact question to be decided after discovery" (Opp'n Br. p. 10), the purpose of discovery is not to discover potential claims, *Arbitron Inc. v. Longport Media LLC,* Case No. 12–02444, 2013 WL 1163492, at *4 (D.N.J. Mar. 19, 2013) (quoting *Twombly*, 550 U.S. at 556). Rather, "[d]iscovery should not serve as a fishing expedition during which [p]laintiff searches for evidence in support of facts he has not yet

---

[3] As set forth *infra.*, throughout the Complaint, plaintiff does not separate allegations as to each defendant but uses the term "Defendant Amarin" to denote all defendants as one corporate entity. (*See* Compl. p. 1 (collectively referring to all defendants as "Defendant Amarin.")

[4] They are: conduct and standards (§ 4); maintaining confidentiality of information (§ 15); right of the associated companies upon plaintiff's termination of employment (§ 18); post-termination restrictions (§ 20); and data protection (§ 21).

[5] Plaintiff does not argue that Amarin Inc. is a party to the Severance Plan. (Opp'n Br.)

pleaded." *Id.* (quoting *Smith v. Lyons, Doughty & Veldhuius, P.C.*, Case No. 07–05139, 2008 WL 2885887, at *5 (D.N.J. Jul. 23, 2008)).

Even if I were to find that plaintiff sufficiently alleged that Amarin Inc. is a party to the Contract, plaintiff does not identify any actions taken by Amarin Inc. in breach of either contract and, instead, broadly refers to "Defendant Amarin" throughout the Complaint. *See, e.g.*, Compl. ¶¶ 172, 174. "Group pleading" by treating multiple entities as a single defendant and "fail[ing] to identify precisely" what actions "each individual defendant undertook to breach the contract," does not satisfy Rule 8. *Integrated Micro-Chip Elecs. Mex. v. Lantek Corp.*, Case No. 18–14112, 2019 WL 4668036, at *2 (D.N.J. Sept. 24, 2019) (quoting *Sheeran v. Blyth Shipholding S.A.*, Case No. 14–05482, 2015 WL 9048979, at *2 (D.N.J. Aug. 10, 2012)).

Moreover, "in the absence of a contract, there can be no breach of an implied covenant of good faith and fair dealing." *Arch Ins. Co. (Europe) Ltd. v. Reilly*, Case No. 20–02080, 2021 WL 4739567, at *8 (D.N.J. Oct. 8, 2021) (quoting *Noye v. Hoffman-La Roche Inc.*, 570 A.2d 12, 14, (N.J. Super. Ct. App. Div. 1990)). Since I find plaintiff has not sufficiently pleaded that Amarin Inc. is a party to the Contract, there can be no plausible claim for a breach of the implied covenant of good faith and fair dealing.

All claims against Amarin Inc. will be dismissed.

### B. Counts I to III Against Amarin Switzerland and Amarin plc

#### 1. Count One: Breach of the Contract

The Contract is governed by Swiss law. (Contract §26.) Article 337 of the Swiss Code of Obligations allows employers and employees to "terminate" employment "with immediate effect at any time for good cause." (ECF No. 67–8 p.4.) "Good cause" is defined as "any circumstance which renders the continuation of the employment relationship in good faith unconscionable for

12

the party giving notice." *Id*. Courts are given "discretion" to determine good cause,[6] (ECF No. 67–9 (Eng. Translation Aug. 22, 2011 J.) p. 8.) (quoting BUNDESGERICHT [BGER] FEDERAL COURT, Aug. 22, 2011, 4A_252/2011 4.2 (Switz.)). "The prerequisites for the existence of good cause are … high," with "only a particularly serious breach" justifying immediate termination. (Eng. Translation Swiss Treatise p. 5; Eng. Translation Aug. 22, 2011 J. p. 7.) "Difficult working conditions, an unfavorable working environment and inadequate leadership are not sufficient to justify an immediate termination." (Eng. Translation Aug. 22, 2011 J. p. 8.). However, violence, "workplace bullying affecting the employee's health," "sexual harassment," and solicitation "to commit criminal acts," amount to good cause. (Eng. Translation Swiss Treatise p. 14.)

Here, plaintiff alleges that "Sarissa and the Amarin Board have made numerous misrepresentations as well as defamatory statements and innuendos regarding Plaintiff." (Compl. ¶ 163.) Plaintiff cites Sarissa's press releases and presentations made prior to the Sarissa-backed nominees were elected to the Board and while Sarissa owned about 5% of "Amarin." (*Id.* ¶¶ 88–109.) Plaintiff alleges "Sarissa's conduct … has impacted [his] standing with Defendant Amarin, with Defendant Amarin's shareholders and the investment community at large, as well as the pharmaceutical industry as a whole." (*Id.* ¶ 164.) These comments made by Sarissa about Amarin's ability to manage money and the leadership's alleged breaches of law and fiduciary duty, while unfavorable, do not, as a matter of law, meet the definition of "good cause" under Swiss law. (*Id.* ¶¶ 96, 101, 108; Eng. Translation Aug. 22, 2011 J. p. 7; Eng. Translation Swiss Treatise p. 5.)

---

[6] "Good cause" is used interchangeably with justified cause in the Swiss Code of Obligations. (ECF No. 67–11 (Eng. Translation Swiss Treatise) p. 4.)

13

Also, the termination must be "immediate," "otherwise, it must be assumed that compliance with the ordinary notice period is subjectively reasonable for the terminating party and the right to immediate termination of the contract is forfeited," (ECF No. 67–10 (Eng. Translation Dec. 29, 2011 J.) p. 6. (internal citations omitted); ECF No. 71–12 pp. 3, 4 (internal citations omitted).) While waiting "two to three days" has been found permissible, longer delay will only be found "permissible if, considering the practical requirements of day-to-day and economic life, this appears to be understandable and justified." (Eng. Translation Dec. 29, 2011 J. p. 7 (internal citations omitted).)

Here, Mikhail alleges that following the proxy election, Amarin Board members "isolat[ed] and disregard[ed] [him] and his input, divest[ed] him of his responsibilities (both overtly and surreptitiously), and communicat[ed] with [his] team members without his knowledge." (Compl. ¶138.) The relevant statements were made by Sarissa from January 10, 2023, through February 28, 2023, and relevant conduct of the Amarin Board occurred from March 7, 2023 to March 21, 2023. Mikhail, however, did not notify Amarin Board of his "constructive termination" until March 27, 2023. (*Id.* ¶¶88–109, 139–148, 155.) The allegations relating to plaintiff's termination do not meet the "immediate" requirement of Article 337 of the Swiss Code of Obligations. Plaintiff's claim for breach of contract on these grounds will be dismissed.

Mikhail also claims to be "entitled" to "Garden Leave" and "acceleration of his stock equity grants under the Contract." (Opp'n Br. pp. 28, 29.) Garden Leave applies "during all or any part of any period of notice." (Contract §19.) In his notice asserting "constructive termination," Mikhail wrote: "Please advise whether Amarin will require me to take Garden Leave." (Compl. ¶155.) Mikhail inquired about Garden Leave but, according to Mikhail, his termination was "immediate" under Article 337 of the Swiss Code of

14

Obligations. (*Id.* ¶ 155, 158–174.) Thus, there was no "period of notice" in which Garden Leave could be taken. (Contract § 19.) Accordingly, plaintiff's claim for breach on this ground will also be dismissed.

Regarding the acceleration claim, acceleration occurs when there is a "Change of Control." (*Id.* § 9.1.) "Control" is defined under the Stock Incentive Plan as "the ownership of more than fifty (50) % of the issued share capital or other equity interest in the Company," and is defined under the Severance Plan as the same 50%, "or the legal power to cause the direction of the general management and policies of the Company." (Stock Incentive Plan § 2(o); Severance Plan § 2(k).) The Internal Revenue Code (Code) states that a "change in the effective control of the corporation" occurs only when "one person, or more than one person acting as a group" acquires "ownership of stock of the corporation possessing 30 percent or more of the total voting power of the stock of such corporation" or "a majority of members of the corporation's board of directors is replaced during any 12-month period by directors whose appointment or election is not endorsed by a majority of the members of the corporation's board of directors before the date of the appointment or election." 26 C.F.R. § 1.409A–3(i)(5)(vi). Mikhail claims that Sarissa "obtained slightly more than a 5% ownership of Amarin," in January (Compl. ¶ 88.), which does not satisfy the 50% threshold in the Stock Incentive Plan.

Mikhail also claims that seven Sarissa nominees were elected to the Board, "expanding the Board to 15 directors." (*Id.* ¶ 110.) The seven non-Sarissa Board members subsequently resigned. (*Id.* ¶¶ 112, 126.) These elections and resignations do not meet the other Code's requirement that the majority of the Board be "replaced." 26 C.F.R. § 1.409A–3(i)(5)(vi).

In addition, the re-constituting of the Board did not change the "legal power to direct or cause the direction of the general management and policies of the Company." (Severance Plan § 2(k).) Directors have a fiduciary duty to

15

act for the benefit of all shareholders, regardless of the source of their nomination.  *See In re OFRA Sec. Litig.*, 654 F. Supp. 1449, 1455 (D.N.J. 1987) ("Under New Jersey common law there can be no doubt that corporate officers have a fiduciary duty to both the corporation and its shareholders."); *see also In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 996 (Del. Ch. 2014) ("It is well-settled Delaware law that a director's independence is not compromised simply by virtue of being nominated to a board by an interested stockholder.")  The election of the Sarissa-nominated Board members did not cede "the legal power to cause the direction of the general management and policies of the Company" to Sarissa.  Additionally, there are no allegations in the Complaint that these members were employees of, or otherwise affiliated with, Sarissa, outside of their nomination.  (Compl. ¶ 112.)  For these reasons, plaintiff has not adequately pleaded a change of control, or a breach of contract under the acceleration clause.

Accordingly, Count One is dismissed.

### 2.  Count II: Breach of Severance Plan

Defendants allege that Count II fails for "two independent and equally sufficient reasons."  First, that plaintiff is not an "Eligible Executive" under the Severance Plan, and second, that plaintiff's allegations "do not meet the definition of a 'Change of Control,' as that term is specifically defined in the Severance Plan."  (Mot. Br. pp. 19–23.)

The Severance Plan defines an "Eligible Executive" as "a United States employee of the Company or any of its Subsidiaries at the level of Vice President or above at the time of the Date of Termination."  (Severance Plan § 2(n).) Defendants argue that Mikhail is not an "Eligible Executive" because he was a Swiss employee.  (Mot. Br. pp. 19, 20 (citing Compl. ¶¶ 52, 59.))  However,

given the unambiguous reference to Mikhail's eligibility for benefits under the Severance Plan (Contract §18.7.), I will assume plaintiff's eligibility.[7]

However, Count Two will be dismissed because it is based on the same insufficient allegations concerning a "Change of Control." For the same reasons as stated above, plaintiff fails to sufficiently allege a "Change of Control" under the Severance Plan. *See supra* Section IV.B.1. Accordingly, Count Two will be dismissed.

### 3. Count Three: Breach of the Implied Covenant of Good Faith and Fair Dealing

The implied covenant of good faith and fair dealing is a "'component of every contract' that requires both parties to a contract act in 'good faith[,]' that is, they must 'adher[e] to "community standards of decency, fairness, or reasonableness."'" *Evonik Corp. v. Hercules Grp., Inc.*, Case No. 16–07098, 2018 WL 5095991, at *9 (D.N.J. Oct. 18, 2018) (alterations in original) (quoting *Iliadis v. Wal-Mart Stores, Inc.*, 922 A.2d 710, 722 (N.J. 2007)). To succeed on such a claim, "a party must prove that '(1) the [opposing party acted] in bad faith or with a malicious motive, (2) to deny the [party] some benefit of the bargain originally intended by the parties, even if that benefit was not an

---

[7] Section 18.7 of the Contract provides:

> The Executive will be eligible for severance pay and benefits under terms and conditions that are no less favourable than pursuant to Amarin Corporation plc's [Severance Plan] effective January 28, 2021 …, subject to any Swiss law requirements. Any benefits to which the Executive may be entitled to receive under the [Severance Plan] or any other Company change in control severance payment plan from time to time will be inclusive of the Executive's notice period entitlement referred to at clause 18.3 above, such that the Executive shall not be entitled to both severance and notice benefits (i.e. the remuneration/benefits paid during notice period will be deducted from the severance pay and benefits, if any are applicable).

17

express provision of the contract." *Id.* (alteration in original) (quoting *Yapak, LLC v. Mass. Bay Ins. Co.*, Case No. 09–03370, 2009 WL 3366464, at *2 (D.N.J. Oct. 16, 2009)). "Where a party has breached a specific term of a contract, that party cannot be found separately liable for breaching the implied covenant of good faith and fair dealing when the two asserted breaches basically rest on the same conduct." *760 New Brunswick Urb. Renewal LLC. v. Navigators Specialty Ins. Co.*, Case No. 20–00877, 2021 WL 287876, at *6 (D.N.J. Jan. 28, 2021) (quoting *Spellman v. Express Dynamics, LLC,* 150 F. Supp. 3d 378, 379 (D.N.J. 2015)). When the two claims are based on duplicative conduct "breach of implied duty claims can be dismissed at the motion to dismiss stage." *Id.* (quoting *Spellman*, 150 F. Supp. 3d at 390).

Outside of plaintiff "repeat[ing] and realleg[ing]" Counts One and Two's allegations (Compl. ¶ 189), plaintiff fails to provide any separate facts to allege a breach of the implied covenant of good faith and fair dealing. Accordingly, Count Three is dismissed.

## V. CONCLUSION

For the foregoing reasons, the Motion will be **GRANTED**. An appropriate order accompanies this opinion.

                                                      */s/ Edward S. Kiel*
                                                      **EDWARD S. KIEL**
                                                      **UNITED STATES DISTRICT JUDGE**

Dated: November 26, 2025